REQUESTED BY: William L. Mersch, Hamilton County Attorney.
What basis should be used by the county treasurer to determine the share of the Personal Property Tax Relief Fund to be received by each taxing agency in the county, as provided by section 77-202.30, 1977 Supp.?
The funds should be distributed in the same ratio as was used in 1976.
Section 77-202.30 creates the Personal Property Tax Relief Fund, which is to be used to replace some of the revenue lost because of exemptions created by sections77-202.25 to 77-202.29 and sections 77-202.36, 77-202.38, and 77-202.40. This fund is distributed to the counties in seven monthly installments, beginning in December. Section77-202.30 then provides:
 ". . . Out of the amount so received, the county treasurer shall retain one per cent thereof and then shall distribute the remainder to each of the taxing agencies within his county on a prorated basis. The amount of the fund to be received by each taxing agency shall be determined by the county treasurer to reflect each taxing agency's share of tax revenue lost in proportion to the total tax revenue lost to all taxing agencies in the county.
 "Each taxing agency shall, in preparing its annual budget, take into account the revenue to be received under the provisions of this section."
The problem is that it is absolutely impossible to comply with this provision, because the amount of revenue lost by each taxing agency in 1978 and subsequent years will be unascertainable.
Section 77-202.25, R.R.S. 1943, provides for partial exemption of six classes of personal property, starting in 1973. Sections 77-202.26 to 77-202.29 provide for increases in such exemptions each year until 1977, when they reached 62 1/2 percent of the value of such personal property. Section77-202.30, before its amendment in 1977, provided that the state should reimburse the taxing agencies for losses incurred by such taxing agencies by reason of such exemption.
Under that system, the taxpayers, of course, listed the personal property in their tax returns. The total value of such property was taken into account in fixing the mill levies for the taxing agencies. The tax on the nonexempt portion of the value was paid by the taxpayer, and the balance (less the one percent retained by the county treasurer) was paid by the state. Since returns had been filed showing the value of the personal property involved, it was a simple matter to calculate how much each taxing agency was entitled to from the state.
With the passage of LB 518 in 1977, however, this was all changed. Instead of 100 percent reimbursement of loss, the Legislature was to appropriate fixed sums to the Fund which were to be distributed to the counties on a pro rata basis. See sections 77-202.37, 77-202.39, and 77-202.41, 1977 Supp. The taxing agencies, then, were to be only partially reimbursed for losses occasioned by the exemptions.
Further, sections 77-202.36, 77-202.38, and 77-202.40
provided for total exemption of these classes of personal property, in steps, with agricultural machinery and equipment, feed, fertilizer, and farm inventory, grain and seed, and poultry, fish, honey bees, and fur-bearing animals to be totally exempted as of January 1, 1978. On January 1, 1979, business inventories are to be totally exempt. On January 1, 1980, livestock will be totally exempt.
Totally exempt property, of course will be listed on the personal property tax returns of taxpayers. There is therefore no way of ascertaining the value of the property which became totally exempt on January 1, 1978, and therefore, no way of ascertaining the loss incurred by the various taxing agencies. In requiring the county treasurer to distribute the county's share of the Fund on the basis of losses of the taxing agencies, section 77-202.30 requires the use of unascertainable figures. In future years, as the other classes of property become totally exempt, there will be no figures at all to use.
However, to fail to distribute the Personal Property Tax Relief Fund because of the deficiencies in the law that we have described would be so catastrophic to the political subdivisions of the state that we cannot suggest that solution. We must therefore try to find some equitable basis of distribution that will come as close as possible to what was intended by the Legislature, recognizing that there are other possible solutions, that there may be difficulties with any solution, and that there is no guarantee that the court will accept the solution we recommend.
Not having current loss figures available, the most obvious method of distribution would be to use past years' loss figures to calculate the percentage to be received by each agency. The most recent year for which figures are available is 1977. Normally that would be the year we would select to be the basis for the calculations by the county treasurer.
However, section 77-202.42, 1977 Supp. appears to use the year 1976 as the year to be used for calculation of the percentage of the fund to go to each county. It provides that the Tax Commissioner shall add to the amount certified as tax revenue lost on or before November 1, 1976, the amount lost in 1974 because of the freeport exemption provided by section 77-1226.01. These figures are used to calculate the percentage to be paid to each county. In using this method the Legislature obviously recognized the difficulty in ascertaining the loss after some of the property became totally exempt. Why it did not specify some similar system for intracounty distribution, we do not know. Exactly why the Legislature chose to use 1974 and 1976, instead of 1977 is not as all clear to us, but that appears to be what was done.
Since distribution to the counties is largely based on 1976 losses, we believe, in the interest of consistency, the distributions within the counties should be on the same basis. In general, each taxing agency should get the same proportion of the county's share as it got in 1976.
We recognize that there will be questions about the freeport loss. Should intracounty adjustments be made because a particular freeport warehouse was located in one taxing agency's territory, and not in another's? We have concluded not, partly on the basis that under the reasoning of School District No. 8 v. School District No. 15,183 Neb. 797, 164 N.W.2d 438 (1969), and Sesemann v. Howell,195 Neb. 798, 241 N.W.2d 119 (1976), it can be forcefully argued that taxing agencies do not suffer any loss by reason of the freeport exemption.
Those cases seem to hold that where a taxing agency collects the full amount of its budget, it has suffered no loss where property which should have been subjected to the levy was not, but was erroneously taxed in some other district.
It can therefore be argued that, since freeport property was exempt in 1974, it was not taken into account in fixing the mill levy, which was therefore higher. The owners of taxable property therefore paid more on their property than they would have in the absence of the exemption, but the taxing agency, as such, suffered no loss. That seems to be the holding of the two cases cited. For this reason, and because of the confusion involved in trying to make the necessary adjustments for the freeport exemption, the calculations should be made simply on the basis of the 1976 distributions.
We also warn that neither distributions to the county nor within the county can continue to be made on this basis in the future. In City of Scottsbluff v. Tiemann,185 Neb. 256, 175 N.W.2d 74 (1970), the court struck down a statute because of the permanent freezing of classes, holding that it was in violation of Article III, Section 18 of the Nebraska Constitution. To continue to distribute the Fund on the basis of 1976 figures, would, in our opinion, be subject to the same objection. There will, as the years go by, be changes exempted in various taxing agencies exempted in various agencies across the state. To permit reimbursement to be based upon the situation existing in one particular year, with to provision to take changes into account, cannot be defended against constitutional attack.
As we have previously indicated, we make no guarantee that the foregoing solution can be defended, and we anticipate many further problems in trying to implement it. We believe the same is probably true of any other possible answer, since none can be based on statutory language. However, we believe any solution is better than a refusal to distribute the Fund at all.